# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

CAROL L. BROWN,        )
          )
          )
    v.        )     **Case No. 3:06-0728**
          )
MICHAEL J. ASTRUE,     )
Commissioner of Social Security,[1]  )

To: The Honorable Thomas A. Wiseman, Jr., Senior District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Secretary of Health and Human Services denying Supplemental Security Income ("SSI") under the Social Security Act (the "Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff can perform her past relevant work as a school custodian is not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and this case should be remanded for further action in accordance with the recommendations contained herein.

---

[1]Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d)(1).

1

## I. INTRODUCTION

The plaintiff filed an application for SSI[2] dated May 21, 2002 (Tr. 17, 52-56),[3] alleging disability due to back surgery, diabetes, low thyroid, depression, spinal nerve damage, and panic attacks (Tr. 62, 72) beginning on January 14, 2002[4] (Tr. 52, 570). The plaintiff was found not disabled within the meaning of the Act on September 19, 2002. (Tr. 26-27, 29-31.) The plaintiff filed a request for reconsideration on November 8, 2002. (Tr. 32, 104-10.) The plaintiff's claim was denied upon reconsideration in a decision dated February 4, 2003. (Tr. 28, 33-34.) The plaintiff filed a request for a hearing before an ALJ on March 24, 2003. (Tr. 35-36.)

A hearing was held on September 30, 2004, before ALJ Linda Roberts. (Tr. 653-79.) The plaintiff was represented by an attorney and testified. A Vocational Expert ("VE"),

_____

[2]The plaintiff never met the Disability Insurance Benefit ("DIB") insured status requirements. (Tr. 51, 57-60.)

[3]There is a confusing array of dates purporting to be the filing date of the plaintiff's application. The Disability Determination and Transmittal forms containing the initial and reconsideration determinations give the filing date as May 21, 2002. (Tr. 26, 28.) The plaintiff signed her Application for SSI on June 5, 2002. (Tr. 56.) Her Disability Report was filled out via phone and dated May 30, 2002. (Tr. 70.) Her Supplemental Disability Report was filled out by the plaintiff and dated May 27, 2002. (Tr. 80.) The Disability Report - Field Office form gives a recommended onset date of May 1, 2002, and indicates that this was the recommended onset date because it was the SSI application date. (Tr. 81.) The ALJ stated that the correct date was May 21, 2002. (Tr. 17.)

[4]The plaintiff first alleged that her condition began on January 11, 2002 (Tr. 62, 81, 93), but a supplemental disability report asserted that she was first affected "3 or 4 years ago" and became unable to work on January 7, 2002. (Tr. 72.)

2

Dr. Kenneth Anchor, was also presented and testified. *Id.* On November 5, 2004, the plaintiff's attorney submitted additional medical evidence. (Tr. 509-12.) The ALJ submitted this evidence to the VE and asked that he answer a new hypothetical question taking the new information into account. (Tr. 126.) On January 12, 2005, the VE concluded that based on the new evidence, the plaintiff could not return to her past work or perform other work. (Tr. 126-28.) On April 8, 2005, the ALJ asked the VE to consider two additional assessments completed by Department of Disability Services ("DDS") physicians. (Tr. 135-37, 338-45, 355-76.) On May 18, 2005, the VE indicated that the plaintiff could return to her past work and that other jobs existed which she could perform. (Tr. 142.)

The ALJ issued an unfavorable decision dated July 5, 2005. (Tr. 15-22.) The plaintiff filed a request for review of the hearing decision dated August 4, 2005.[5] (Tr. 10-15.) The ALJ's decision became the final decision of the Secretary when the Appeals Council denied the plaintiff's request for review on June 8, 2006. (Tr. 6-9.)

The plaintiff now requests judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). Before the Court is the plaintiff's motion for judgment on the administrative record and accompanying memorandum (Docket Entry Nos. 10 and 11), to which the defendant has responded (Docket Entry No. 13). The plaintiff seeks an order

---

[5]The request for review form is dated August 4, 2005. (Tr. 12-13.) However, the record also contains a letter from the plaintiff's attorney dated August 25, 2005, captioned as a request for review of the July 5, 2005, unfavorable decision and stating that the completed Request for Review of Hearing Decision form was enclosed. (Tr. 14.)

3

vacating the decision of the ALJ and remanding the case for further proceedings to include

"a new Administrative Law Judge Hearing."  Docket Entry No. 11, at 16.

## II. BACKGROUND

The plaintiff was born on August 30, 1964, and she was thirty-eight years old on

May 21, 2002, the date of the alleged onset of disability.  (Tr. 657.)  The plaintiff has a high

school diploma, and her previous work included jobs as a cashier and school custodian.

(Tr. 657-58.)  She suffered an on-the-job injury in January 2002 while working as a school

custodian, and was unable to return to work.  (Tr. 658.)  The ALJ found that the plaintiff

did not engage in any other substantial gainful activity subsequent to her date of onset in

May 2002.  (Tr. 21.)

### A. Chronological Background: Procedural Developments and Medical Records[6]

Records from the Middle Tennessee Family Wellness Group ("MTFWG") were

provided beginning in October 1996 and continuing through February 2, 2002.  (Tr. 146-

208.)  The Court has not summarized these records in detail given their remoteness to the

---

[6]Every attempt to decipher the medical evidence of record was undertaken;
however, some handwritten notations or poor copies of records may have been illegible.
General information on the medical terms used and drugs prescribed to the plaintiff was
obtained from Drugs.com and similar reputable online resources, unless otherwise
indicated.

4

plaintiff's alleged date of onset in January 2002. The records demonstrate her history of thyroid difficulty, routine PAP smears, and onset of and treatment for diabetes. (Tr. 177-208.) There are also notations relating to anxiety and depression and treatment with antidepressants as early as September 1998 and ongoing refills of drugs such as Paxil, Prozac, and Zoloft. (Tr. 153-61.) On April 25, 2001, the plaintiff reported to the MTFWG complaining of upper back, shoulder, and chest pain, possibly related to moving heavy desks at work on the previous day. (Tr. 151.) She was diagnosed with cervical strain and given Celebrex in addition to refills of her other medications. *Id.*

On January 14, 2002, the plaintiff presented to the MTFWG, complaining of middle and low back pain radiating down her right leg after an accident at work.[7] (Tr. 150.) Ms. Elaine Jones, a nurse practitioner, filled out her chart on this visit, and she indicated a gradual onset of pain, which had "progressively [gotten] worse." The plaintiff experienced mild relief with ibuprofen. The plaintiff's back was tender, more so on the right than the left, and she had pain with flexion. Ms. Jones diagnosed lower back pain with sciatica and prescribed Flexeril and Relafen. She noted "off work today," and she referenced work restrictions (not in the record) with a follow-up in two weeks. She recommended several tests for thyroid, cholesterol, and diabetes, and refilled the plaintiff's

_____

[7]The plaintiff's injury occurred on January 11, 2002, which was a Friday. (Tr. 658.) She did not work Saturday or Sunday and reported to Dr. Ladd's office and was seen by nurse practitioner Jones on Monday January 14, 2002.

Paxil. *Id.* The plaintiff's tests revealed that her blood glucose was elevated and her thyroid was low, and notations suggested appropriate adjustments to her medications and follow up in three months. (Tr. 175.) She was also given a cholesterol test, the results of which showed that her LDL levels were elevated. (Tr. 174-75.) Ms. Jones called the plaintiff with these results on January 22, 2002, advised her of the test results and told her to decrease fat, cholesterol, and calories and recheck in six months. (Tr. 174.) If her LDL levels were still over 100, Ms. Jones indicated that they would start medication. *Id.*

On January 29, 2002, the plaintiff returned to MTFWG and Ms. Jones for a follow-up appointment for her back pain. (Tr. 149.) Her pain was no better, and the plaintiff reported worse pain down the right leg and rated her pain at an 8 out of 10. Her back was tender at L1-2. The plaintiff received an intramuscular injection of Toradol and a supply of Lortab. She was to follow-up in a week with no work until follow-up. *Id.*

On February 1, 2002, Dr. Bernui, an osteopath practicing at the MTFWG, sent the plaintiff for an MRI of the lumbar spine. (Tr. 172.) The plaintiff presented with a history of low back, right hip, and right leg pain with numbness in her right foot. The MRI revealed a disc bulge at the L5-SI level with disc dehydration. There was a small central disc protrusion that resulted in "very mild thecal sac compression," but "nerve root compression [was] not demonstrated." The radiologist diagnosed mild changes of degenerative disc disease at L4-5 and L5-SI levels. (Tr. 172, 442.)

6

On February 5, 2002, the plaintiff returned to the MTFWG and was again seen by Ms. Jones for follow up. (Tr. 148.) Ms. Jones noted MRI results of a slipped disc (HNP) at L4-5 and L5-SI. She indicated that the plaintiff had an appointment with Dr. Abrams, a neurosurgeon, that morning. The nurse noted that the plaintiff was "better on Prednisone" with less radiation down the right leg. She also noted, however, that the plaintiff "look[ed] uncomfortable [when] sitting." Ms. Jones indicated she would follow up in two to three weeks for her diabetes. *Id.*

On February 13, 2002, the plaintiff reported to Hendersonville Medical Center for physical therapy with Gatha Wilson, P.T. (Tr. 211-12.) The plaintiff presented with low back pain rated at a 6 out of 10 that day with intermittent right leg symptoms since January 2002, with onset of symptoms caused by lifting at work. (Tr. 211.) The plaintiff reported worsening pain with prolonged walking and that her pain disturbed her sleep. An MRI performed two weeks prior produced a diagnosis of lumbar radiculopathy (nerve irritation caused by damage to the discs between the vertebrae). She had a history of diabetes and hypothyroidism. She was currently taking Skelaxin, Naproxyn, and Paxil, as well as medications for her thyroid deficiency and diabetes. The plaintiff reported being on medical leave due to back pain. *Id.*

On examination, the plaintiff exhibited tenderness to touch, especially on the right side, and she had a limited lumbar range of motion. Functional limitations were noted as

7

walking more than ten minutes and difficulty sleeping. She was treated with a hot pack and electrical stimulation, followed by therapeutic exercises. *Id.* The physical therapist discussed the goals of therapy sessions to occur two times a week for the next three weeks, including increasing range of motion, reducing pain, increasing strength and the time that the plaintiff was able to stand/walk. (Tr. 212.) On May 14, 2002, Gatha Wilson completed a discharge summary for the plaintiff's physical therapy sessions, which occurred between February 13, 2002, and February 22, 2002, for a total of three treatments. (Tr. 210.) She indicated that the short-term goals were "partially met," but that the long-term goals were not because the lower extremity symptoms remained at the time of the last visit, and she was unable to assess the plaintiff's musculoskeletal status as of the last visit. She indicated that the plaintiff did not complete her sessions due to "Lack of Progress/Plateau." *Id.*

On February 22, 2002, the plaintiff returned to MTFWG and Ms. Jones for follow up on her diabetes. (Tr. 147.) The plaintiff was, however, in "too much pain to discuss [her diabetes]." The plaintiff was in physical therapy but complained of severe low back pain with radiation down the right leg and numbness in the right leg and foot, and she was not sleeping well. The plaintiff reported that Dr. Abrams told her that she could return to work that day. Ms. Jones observed that she was "tearful" and "sitting uncomfortably" during the examination. She noted that the plaintiff was to see Dr. Uteg on Monday morning.

Ms. Jones gave her more Lortab for her severe pain, as well as another drug for nerve pain. *Id.*

The plaintiff presented to Dr. Robert P. Uteg, a neurosurgeon, on February 25, 2002. (Tr. 315.) She complained of back pain and reported taking two to three Lortab per day. Dr. Uteg noted right back pain, and right leg pain with some thigh and calf pain. She had weakness in her right foot and an uneven gait. Dr. Uteg diagnosed diabetes myelitis and right L5 radiculopathy. He referred her for an EMG with Dr. Wolfe. *Id.*

Dr. Uteg wrote a letter to Ms. Jones at MTFWG dated February 25, 2002.[8] (Tr. 311-13, 410-12.) He reported that the plaintiff had been experiencing back pain for about four to five weeks, precipitated by a lot of lifting and bending on the job. The plaintiff experienced pain in the "low belt line" and reported the pain to her supervisor. The pain grew worse and began to radiate into her right buttock and across her thigh and into the calf. She also had numbness and tingling of the foot and toe. She had no left leg radiating pain, numbness or tingling, but her right foot was weaker and it dragged when she was tired. She had one epidural corticosteroid injection, which made her pain worse. She said

_____

[8]Dr. Uteg addressed the letter to "Elaine Jones, M.D.," and his greeting read "Dear Dr. Jones," but it is clear from the records provided by MTFWG that Elaine Jones is a nurse practitioner and not a medical doctor. However, she did sign many of the plaintiff's charts, perhaps explaining Dr. Uteg's assumption that she was the referring doctor. *See, e.g.,* Tr. 176 (letterhead listing Elaine Jones as RNC, FNP, not MD), and Tr. 147 ("E. Jones NP" circled at the bottom of the plaintiff's chart to indicate treatment by Ms. Jones on that day).

9

that physical therapy with ultrasound electrostimulation "felt good," but only briefly. Dr. Uteg recounted her history of diabetes and thyroid problems and listed her current medications, including diabetes medications, Lortab, Paxil, thyroid medications, and an antihistamine for pain and to help her sleep. *Id.*

On physical exam, the plaintiff had "give away" weakness in the right leg, but normal power on the left side. (Tr. 312.) An MRI scan showed small right sided L4-5 herniated disc and facet joint hypertrophy. Dr. Uteg indicated that the plaintiff had degenerative disease at the L5-SI disc but no clear herniation. He diagnosed "probable right L5 radiculopathy, secondary to foraminal stenosis from facet joint hypertrophy and small right L4-5 herniated disc." Dr. Uteg recommended conservative therapy, and he recommended Naprosyn twice daily to replace Lortab. He also recommended an EMG and NCV to aid in diagnosis. *Id.* Dr. Uteg opined that if the plaintiff's condition worsened and if the diagnosis of radiculopathy was confirmed, she might require surgery. (Tr. 313.)

On February 26, 2002, the plaintiff reported to Dr. Jimmy V. Wolfe, a neurologist, for an EMG of the right and left legs. (Tr. 314.) Dr. Wolfe's clinical interpretation of the EMG report was that the plaintiff had a chronic left L4-5 radiculopathy.

The plaintiff returned to Dr. Uteg on March 7, 2002, and Dr. Uteg noted the EMG result of a chronic left L4-5 radiculopathy. (Tr. 310.) He then wrote a letter to Dr. Bernui of the MTFWG dated the same day, reporting that the plaintiff was still having intractable

10

low back pain and worse buttock and radiating leg pain. (Tr. 309, 409.) The plaintiff had reported Charlie horses and cramps in her right leg that were particularly bad recently. Dr. Uteg advised the plaintiff that given her symptoms, she would "probably need to have surgery." Dr. Uteg opined that there was "close to an 80% chance" that with a foraminotomy and diskectomy on the right at L4-5 that the plaintiff would have marked improvement in her right buttock and radiating leg pain. *Id.*

Dr. Uteg again saw the plaintiff on March 27, 2002. (Tr. 308.) Notes from that visit include only indications that the plaintiff was taking Lortab and Ibuprofen in addition to her diabetes, thyroid, and sleep medications, and that her diagnosis was of right L4-5 foraminal stenosis secondary to right L4-5 disc facet hypertrophy. *Id.* Dr. Uteg followed up this visit with a letter to Dr. Bernui dated March 28, 2007. (Tr. 307, 408.) Dr. Uteg opened the letter with: "I thought we would hear from her, as three weeks ago she was pretty miserable with right leg pain from a pinched L5 nerve as the result of L4-5 disc herniation and facet joint hypertrophy." He explained that the plaintiff's insurance had expired and she was attempting to get workers' compensation to pay for her surgery. She continued to take Ibuprofen. The plaintiff had weakness in her right foot and severe, radiating pain from the belt line down the buttock, thigh, and calf, all the way to her foot. Dr. Uteg opined, "this [was] a work-related injury and [the plaintiff] has nerve damage." He also advocated surgery "sooner rather than later," citing her pain and poor quality of

11

life.  He additionally pointed out that her diabetes made her chances of suffering nerve damage greater than if she were a non-diabetic.  Dr. Uteg indicated that he was going to send copies of her medical records to the plaintiff to help her attorney attempt to procure workers' compensation coverage.  *Id.*

The plaintiff and her husband met with Dr. Uteg on April 5, 2002.  (Tr. 230.) Dr. Uteg discussed the plaintiff's history and current condition as well as her surgical options.  He explained the risks of surgery, which included death, worsening of nerve damage, failure to alleviate pain and recurrence of a herniated disc in the future.  After asking appropriate questions, the plaintiff agreed to proceed with surgery, which was planned for April 8, 2002.  *Id.*

The plaintiff was admitted to Skyline Medical Center on April 8, 2002, for excision of an intervertebral disc by surgeon Dr. Robert Uteg.  (Tr. 214.)  The pre-surgical report indicated that the plaintiff had been experiencing back pain since late January, probably work-related, that worsened over the next several weeks and began to radiate into the right buttock and across the thigh and into the calf.  (Tr. 227.)  The plaintiff also experienced numbness and tingling on her foot and in her great toe.  She was treated with physical therapy with no lasting improvement and epidural cortisone injection made her pain worse. She was entering the hospital for surgical removal of a herniated disc at L4-5 on the right.  The plaintiff had a history of diabetes for a year and a half, history of a thyroid

12

problem, and was currently taking Glucophage and Amaryl for diabetes, Lortab for pain, Paxil (depression/anxiety), thyroid supplementation and chlorpheniramine (antihistamine). *Id.*

The operative report completed by Dr. Uteg indicated that the plaintiff presented with a right L5 radiculopathy secondary to spondylosis and L4-5 disc herniation. (Tr. 216.) Surgery was indicated due to "[i]ntractable right leg pain, numbness and tingling with MRI proven L4-5 pathology." The procedure performed was a right L4-5 microlumbar diskectomy and foraminotomy. There were no complications. *Id.*

Dr. Uteg requested a cardiac consultation as a result of an abnormal EKG.[9] (Tr. 219.) Dr. Nagendra Ramanna performed the consultation on April 8, 2002, examining the plaintiff following surgery. (Tr. 220.) The EKG was dated April 5, 2002, and revealed a nonspecific T wave abnormality, and Dr. Ramanna could not rule out an inferior infarction. Dr. Ramanna recommended an echocardiogram with doppler, starting aspirin after clearing it with Dr. Uteg, and scheduling a stress test when the plaintiff was able to exercise. *Id.* The echocardiogram and doppler study performed on April 8, 2002, revealed normal results. (Tr. 231-32.) The plaintiff was discharged on April 9, 2002. (Tr. 297.) She was sent home with printed instructions and her family demonstrated the ability to manage her post operative care at home. *Id.*

───────────────

[9]The EKG was taken on April 5, 2002, and was therefore abnormal before the plaintiff went into surgery on April 8, 2002. (Tr. 220.)

13

The plaintiff presented to Dr. Uteg for her first post operative appointment on April 18, 2002, and Dr. Uteg described his findings in another letter to Dr. Bernui. (Tr. 305.) She was ten days post lumbar microdiskectomy and foraminotomy, and she reported some incisional pain and muscle tightness. Her radiating right leg pain had improved but she still had some buttock pain and numbness in her right foot. Dr. Uteg noted her abnormal EKG and stated that he would forward the test to Dr. Bernui for his review. Dr. Uteg reported that the plaintiff's incision was healing well. He recommended four walks a day in addition to knee-to-chest stretches. He loosened her restriction on sitting. Dr. Uteg gave her a prescription for hydrocodone and a Medrol Dosepak to reduce nerve swelling. *Id.* He also prescribed Robaxin, a muscle relaxer, and stated that if the Medrol caused elevated blood sugar, he would switch her to Advil or Aleve. (Tr. 306.) Dr. Uteg recommended follow up in two weeks and beginning physical therapy at that time. An additional notation at the bottom of the letter indicated that the plaintiff phoned on April 22, 2002, and reported "rough nights" due to back pain but that her back pain had improved compared to a week ago. *Id.*

On May 2, 2002, the plaintiff saw Dr. Uteg. (Tr. 304.) He noted that she was taking Ibuprofen and a notation from May 1, 2002, at the bottom of the treatment note indicated that they were unable to schedule repeat on pool therapy due to the plaintiff's insurance being lapsed. *Id.* A May 2, 2002, letter to Dr. Bernui elaborated that the plaintiff was taking

14

Vicodin for back pain and that she was still experiencing residual buttock and radiating leg pain, although the pain was less than before surgery. (Tr. 303.) However, she was experiencing more numbness in her foot with mild foot drop, or weakness in the foot. Her incision was healing slowly but without infection. The plaintiff reported feeling tired and having little energy, and that her back pain could keep her up at night. Robaxin was not very helpful with this. Dr. Uteg recommended a new MRI to rule out recurrent herniated disc. He stated that her need for narcotics three weeks post this type of surgery was unusual. He recommended three days a week of pool physical therapy with follow up in two weeks. *Id.*

The plaintiff filed her application for SSI on May 21, 2002. (Tr. 17.) She alleged disability due to back surgery, diabetes, low thyroid, depression, spinal nerve damage, and panic attacks, with a date of onset of disability of January 14, 2002. (Tr. 62, 72, 52, 570.)

Dr. Uteg again wrote to Dr. Bernui on May 23, 2002. (Tr. 302.) He reported that they were unable to get a repeat MRI. The plaintiff was still experiencing right buttock and radiating leg pain, as well as foot numbness and weakness. Dr. Uteg opined that the weakness had improved slightly compared to three weeks ago. Dr. Uteg gave the plaintiff a trial of Neurontin for leg pain. Dr. Uteg continued to recommend physical therapy and discussed increasing walks and stretching exercises. *Id.*

The plaintiff returned to Dr. Uteg on June 6, 2002, but his treatment notes indicate only that she has a history of surgery on her "right L4-5" vertebrae on April 8, 2002. (Tr. 301.) She returned on June 20, 2002, complaining of right leg pain and weakness, with foot numbness. (Tr. 300.) Dr. Uteg prescribed more Ibuprofen and scheduled a follow up on July 11, 2002. *Id.* A letter to Dr. Bernui dated June 20, 2002, described the plaintiff's progress in more detail. (Tr. 299.) Dr. Uteg reported "modest improvement" in the plaintiff's right buttock and leg pain. She also reported slight improvement in her foot weakness which was confirmed on examination. She still demonstrated decreased sensation in the great toe and bottom of the right foot. She was reduced to 800 mg of Ibuprofen two times per day for pain. She reported walking, but Dr. Uteg observed that she appeared to have gained a significant amount of weight. *Id.*

The plaintiff was seen in the offices of Dr. Robert Ladd, an osteopath, on June 26, 2002. (Tr. 354.) The plaintiff's chart was filled out and signed by Penelope L. Hill, N.P. The plaintiff complained of back pain and needed refills on her medications. She had an irregular gait and decreased range of motion secondary to back pain. Diagnoses included diabetes myelitis, back pain, and a urinary tract infection. *Id.*

The plaintiff returned to Dr. Ladd's office and was seen again by Ms. Hill on July 16, 2002. (Tr. 353.) She complained of back pain and reported for a recheck of blood sugar. Her back continued to hurt and she was "now concerned" since she had surgery on April 2.

16

She needed a referral to a neurosurgeon for her insurance. She had decreased range of motion due to pain. Diagnoses included back pain, diabetes, depression, anxiety, and reflux (GERD). *Id.*

On July 31, 2002, Alan Yarbrough, Ed.D., performed a psychological examination of the plaintiff on behalf of Tennessee Disability Determination Services. (Tr. 318-20.) Dr. Yarbrough described the plaintiff as "somewhat disheveled" and moderately obese, and reported that she drove herself to the interview and arrived alone. (Tr. 318.) She had no history of psychiatric hospitalizations and received no mental health treatment. Her current medications included Paxil, Lortab, Prevacid (reflux/heartburn), glyburide (diabetes), ibuprofen, Levoxyl (thyroid), methocarbamol (muscle relaxant), cyclobenzaprine (same), Glucophage, and buspirone (anti-anxiety). Her medications were prescribed by her general practitioner. She had no history of alcohol or nonprescription drug use. *Id.* The plaintiff had a high school education and was married with four children aged seven to nineteen. (Tr. 319.) Her employment history consisted solely of work for White House Middle School from 1998 through January 2002 doing janitorial work.

She reported feeling "anxious most of the time." She reported having panic attacks two to three times per week. She experienced increased anxiety, difficulty breathing, excessive perspiration, chest pain, dizziness, and nausea during her panic attacks. She reported avoiding leaving home and preferring to have a traveling companion if she did

17

have to leave. The plaintiff additionally reported a depressed mood for "a long time" with difficulty sleeping. She described a loss of interest in activities such as caring for her flowers. She also described feeling worthlessness, but denied feeling suicidal. The plaintiff reported that her depression worsened after injuring her back in January 2002 and being unable to work.

The plaintiff's activities of daily living included caring for her children in the home, doing food preparation and supervising chores. She avoided driving but could do so if necessary. She did her own shopping approximately once a week, accompanied by her children to carry items. She related good days to those when her mood was less depressed, and bad days to the times when she was more depressed.

Dr. Yarbrough tested the plaintiff and found that her short term memory was "at least mildly impaired," due to her inability to recall objects after five minutes. She also had trouble performing serial sevens and made errors when performing serial threes. *Id.*

Dr. Yarbrough described her affect as "mildly depressed." (Tr. 320.) There was no evidence of a psychomotor disturbance, but the plaintiff did report seeing a woman in her home on two separate occasions, but the woman disappeared when she blinked her eyes. Dr. Yarbrough estimated that she was in the "borderline range of intelligence."

Dr. Yarbrough assessed that the plaintiff was experiencing a mild impairment in her ability to understand. She had a moderate impairment of short-term memory with a mild

18

to moderate impairment in concentration. She was socially appropriate. She had a mild impairment of ability to adapt and be aware of normal hazards in the workplace due to her concentration impairment. She also experienced a mild impairment in setting realistic goals and making plans independent of others, due to her level of intellectual functioning. Dr. Yarbrough diagnosed a major depressive episode, single episode, mild. He noted a panic disorder with agoaphobia (mild). He assessed a borderline intellectual functioning. He assigned a current GAF of 50. *Id.*

On August 27, 2002, the plaintiff returned to Dr. Ladd's office for refills and due to pain in her neck and back.[10] (Tr. 352.) She reported that Buspar was not working. She had decreased range of motion of the spine secondary to pain. Her medications were refilled and diagnoses included back pain, diabetes myelitis, and reflux. *Id.*

Dr. James T. Trent completed a Psychiatric Review Technique form on September 10, 2002. (Tr. 321-34.) He also completed a Mental Residual Functional Capacity Assessment ["RFC"] dated the same day. (Tr. 335-37.) On the Psychiatric Review Technique form, Dr. Trent indicated that the plaintiff suffered from an affective disorder, a depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, and feelings of guilt or worthlessness. (Tr. 324.)

---

[10]Nurse practitioner Hill signed the plaintiff's chart.

He indicated that the plaintiff suffered from "Major Depression, Single Episode MILD."[11]

Under anxiety-related disorders, Dr. Trent indicated generalized persistent anxiety accompanied by autonomic hyperactivity.  (Tr. 326.)  He indicated a panic disorder with agorophobia (mild).[12]  *Id.*  Dr. Trent indicated that the plaintiff experienced a moderate degree of limitation in the areas of activities of daily living, difficulties in maintaining social functioning, maintaining concentration, persistence, or pace and no episodes of decompensation of extended duration.  (Tr. 331.)  The "Consultant's Notes" section of the form summarizes the report of Dr. Yarbrough.  (Tr. 333.)

Dr. Trent also completed a Mental Residual Functional Capacity Assessment. (Tr. 335-37.)  He indicated that the plaintiff was moderately limited in the ability to understand and remember detailed instructions but not significantly limited in ability to remember locations and work-like procedures and understand and remember very short and simple instructions.  (Tr. 335.)  The plaintiff was not limited in the ability to carry out short and simple instructions, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others, and to

_____

[11]This is the exact language that Dr. Yarbrough used in his diagnosis following an examination.  (Tr. 320.)

[12]Again, this directly tracks the language contained in Dr. Yarbrough's assessment. (Tr. 320.)

20

make simple work-related decisions. *Id.* However, she was moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 335-36.) She was also moderately limited in her ability to interact appropriately with the public, but not significantly limited in any other category under the heading of "social interaction." (Tr. 336.) She was not limited in any category under the heading of "adaptation." *Id.* Finally, Dr. Trent summarized these findings in narrative form by stating that the plaintiff would have difficulty understanding and remembering detailed instructions, carrying out detailed instructions and maintaining concentration and attention and completing a normal work day and work week, and would additionally have difficulty interacting with the public, but could still "perform adequately." (Tr. 337.)

Dr. Lawrence Schull, a DDS physician, completed an RFC assessment on September 14, 2002. (Tr. 338-45.) He indicated that the plaintiff could lift/carry fifty pounds occasionally and twenty-five pounds frequently, stand/walk and sit about six hours in an eight-hour day, and indicated that pushing/pulling was unlimited. (Tr. 339.) Dr. Schull provided handwritten notes to explain these conclusions, but they are simply illegible. (Tr. 339-40.) All postural limitations were marked "frequently," and there were

21

no manipulative, visual, communicative, or environmental limitations established. (Tr. 340-43.) Dr. Schull indicated that there were no treating or examining source statements regarding the plaintiff's physical capacities in the file. (Tr. 344.)

A Vocational Assessment, dated September 18, 2002, found that the plaintiff could perform her past relevant work. (Tr. 102-03.) On September 19, 2002, the plaintiff was found not disabled within the meaning of the Act. (Tr. 26-27, 29-31.)

The plaintiff returned to Dr. Ladd's office on October 1, 2002, complaining of pain from "head to ears" with chest pain, and seeking a refill on her medications. (Tr. 351.) The treatment plan included a neurosurgeon referral, pain clinic referral, several blood tests were ordered, and the plaintiff was given samples of Prevacid. *Id.* Her diagnoses included degenerative disc disease, lumbar radiculopathy, diabetes myelitis, and anxiety/depression. *Id.*

On November 6, 2002, the plaintiff returned to Dr. Ladd's office and was seen by an unknown doctor or nurse, complaining of back pain, chest pain, and coughing, and she was diagnosed with bronchitis. (Tr. 350.) The plaintiff was seen by Dr. Ladd on December 5, 2002, but notes from this visit are almost entirely illegible, except for diagnoses of epigastric pain, PUD (peptic ulcer), and gastroenteritis. (Tr. 349.)

The plaintiff filed a request for reconsideration of the denial of SSI benefits on November 8, 2002. (Tr. 32, 104-10.)

The plaintiff was seen by Dr. Son D. Le for an initial consultation on referral from Dr. Ladd on November 19, 2002. (Tr. 478-79.) Dr. Le indicated that the plaintiff was being seen for "chronic low-back pain with radiation of the pain down her right leg." (Tr. 478.) The plaintiff reported onset of back pain on January 14, 2002, following a work injury of lifting a thirty to forty pound trash can. She reported that the pain began radiating down her right leg two weeks later. She was referred to Dr. Abram, and an MRI of the spine showed mild degenerative changes in the L4-5 and L5-SI discs. The plaintiff did not respond to physical therapy or epidural steroid injections, and her pain has progressively worsened. Dr. Robert Uteg performed surgery on April 8, 2002. The plaintiff reported that surgery did not help and since her surgery, she has been "dealing with it," and has been managed on mild narcotic pain medications.

The plaintiff related to Dr. Le that her pain was constant and involved cramp-like sensations and dullness in the right lower extremity. Walking, sitting, and bending made her symptoms worse, and "not much" made her symptoms better. Dr. Le reported a past medical history of thyroid disease, diabetes, and depression for the past three years. *Id.* Dr. Le observed on physical exam that the plaintiff walked with a limp favoring the right leg, had intact range of motion of the lumbar spine, tenderness over the iliolumbar junction and SI joint on the right hand side. (Tr. 479.) The plaintiff demonstrated palpable

tenderness along the right sciatic nerve, and pinprick sensation was decreased in the right buttock area and right calf.

Dr. Le diagnosed "lumbar post laminectomy syndrome," "[c]hronic radiculopathy low-back pain . . . probably related to her right SI joint dysfunction and/or myofascial pain syndrome." Dr. Le noted that he would also consider a diagnosis of sciatic neuropathy. He recommended preliminary electrodiagnostic studies, potentially followed by SI joint injection or trigger point injections. He prescribed Celebrex and Lortab. *Id.*

On December 19, 2002, Dr. Ladd completed a DDS form indicating that the plaintiff was capable of managing her own funds should she be awarded benefits. (Tr. 348.)

On January 2, 2003, the plaintiff presented to the Volunteer Behavior Health Care System ("VBHCS")[13] and was seen by Kevin Bagwell, M.S.[14] (Tr. 401-05.) The plaintiff complained of depression, anxiety, panic attacks beginning four years previous, "up and down mood," "uncontrollable bout[s] of crying," difficulty sleeping, nausea, shortness of breath, and cold chills. (Tr. 401.) The plaintiff reported that these symptoms had increased

---

[13]The Volunteer Behavioral Health Care System serves a thirty one county area of Middle and Southeastern Tennessee. This organization is made up mental health centers offers a full array of mental health and substance abuse services available to residents of the area. These services include outpatient, emergency, transitional/residential, forensics, consultation and education. *See* www.vbhcs.org.

[14]The plaintiff apparently had appointments for an initial assessment on November 7, 2002, and again on November 27, 2002, but records indicate that she did not show up for these appointments. (Tr. 406.)

24

in frequency and severity over the past year, and that her symptoms had increased since her back pain began. The plaintiff reported that she had not had previous counseling, but that she was being treated with psychotropic medications by her primary care provider. She indicated that Paxil helped to stabilize her mood but that she needed help with panic attacks. The plaintiff reported no substance abuse problems or history of suicidal behavior. She related that she suffered childhood physical and sexual abuse.[15] *Id.* The plaintiff reported being sexually abused by her maternal uncle when she was eleven years old, and experiencing verbal abuse at the hands of her parents. (Tr. 402.) Her family history of mental illness was unknown, although her brother had an undiagnosed "problem with nervousness."

The plaintiff's physical symptoms included racing heart, diarrhea, constipation, stomach pains, frequent headaches, faintness, numbness, tingling, seizures, trembling, clumsiness, weakness, memory trouble, trouble thinking, shortness of breath, chest pain, itching or burning skin, aching muscles, aching joints, and back pain. *Id.* Her current medical conditions included anxiety, diabetes, learning disability, manic/depression, and thyroid disease. (Tr. 403.) She had a family history of thyroid disease, diabetes, high blood pressure, heart disease, anxiety and depression. *Id.*

---

[15]Under the heading "history of abuse," the intake notes indicated that the plaintiff had suffered no "physical" abuse, but did suffer "emotional" and "sexual abuse." (Tr. 401-02.)

Mr. Bagwell completed a "Clinical Summary," rating the plaintiff's level of distress as "moderate" and her level of impairment as "severe . . . due to report of severity of back pain leading to inability to work." (Tr. 405.) Mr. Bagwell also noted that the plaintiff experienced "panic attacks that may interfere with potential employment." He reported that her depression and anxiety seemed "to stem from abusive childhood as well as current medical issues," and that she was also affected by "anticipation of maladies to come given her mothers [sic] extensive history of health problems." He recommended individual psychotherapy and medication management. *Id.*

The plaintiff returned to Dr. Le on January 3, 2003, complaining that Lortab was not helping her symptoms. (Tr. 477.) Electrodiagnostic study results did not show evidence of radiculopathy. The plaintiff exhibited tenderness over the right posterior/superior iliac spine and the anterior/superior iliac spine, as well as the lateral hip and thigh of the right-hand side. Dr. Le assessed lumbar post laminectomy syndrome with probable right SI joint dysfunction and/or myofascial pain of the pelvic girdle muscle. Dr. Le recommended a right SI joint injection, increased her Lortab, discontinued Flexeril and substituted Robaxin, and scheduled a follow-up. *Id.* Dr. Le performed the intra-articular joint injections that day. (Tr. 490.)

The plaintiff missed a scheduled appointment at VBHCS on January 15, 2003, with the noted reason listed as "had her baby."[16] (Tr. 400.) The plaintiff also did not appear for appointments on January 20, 2003, January 27, 2003, or on February 6, 2003. (Tr. 399-400.)

The plaintiff was seen by Donna Venters, MSN - ANCC,[17] at VBHCS for a psychiatric evaluation on February 3, 2003. (Tr. 393-94.) The plaintiff related that she had been taking Paxil for the depression for two to three years and that it "helped some," but that her problems have worsened since her back surgery. (Tr. 393.) She reported feeling "real hyper" and breaking into a cold sweat during the attacks, which occurred one to two times a week. The plaintiff also reported having nightmares that woke her up at night, crying spells, and reported having hallucinations of seeing people and hearing someone call her name as recently as three months previous.

The plaintiff's medical symptoms included racing heart, diarrhea, constipation, stomach pain, frequent headaches, aching muscles, aching joints, back pain, faintness, numbness, tingling, seizures, trembling, clumsiness, weakness, memory trouble, trouble thinking, shortness of breath, chest pain, and itching or burning skin. She reported that her brother took medication for anxiety. *Id.*

---

[16]On February 3, 2003, the plaintiff was noted to have four children aged 19, 13, 10 and 8. (Tr. 393.) There are other references in the record to the plaintiff's hysterectomy in 1994. *See, e.g.*, Tr. 496.

[17]Ms. Venters holds a Masters of Science in Nursing (MSN) and is accredited by the American Nursing Credentialing Center (ANCC).

27

Ms. Venters described the plaintiff's behavior as "anxious," and her mood as "depressed" and "anxious." (Tr. 394.) Ms. Venters provided a diagnosis[18] of a clinical disorder (Axis I) of "Major Depressive Disorder, Recurrent, Moderate," with general medical conditions (Axis III) of "diabetis [sic], back pain," and listed the plaintiff's psychological and environmental stressors (Axis IV) as "Severe-Occupational" and "Mild-Family/Primary Support." She assessed the plaintiff's current GAF at 50. She recommended increasing the plaintiff's dosage of Paxil and prescribed Atarax (anti-anxiety) and Seroquel (depression/bipolar disorder) with follow-up in four weeks. *Id.*

On February 4, 2003, Dr. Frank Kupstas Ph.D., a DDS consultant, completed a Psychiatric Review Technique form. (Tr. 355-76.) He evaluated the plaintiff in the cateogries of affective disorders and anxiety-related disorders. (Tr. 355.) Dr. Kupstas indicated that the plaintiff suffered from a medically determinable impairment that did not precisely satisfy the diagnostic criteria, but his handwritten explanation is illegible. (Tr. 358.) He indicated that the plaintiff suffered from anxiety as evidenced by "[r]ecurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week." (Tr. 360.) Dr. Kupstas indicated that the plaintiff suffered from mild to moderate restriction of activities of daily living, moderate difficulties in maintaining social

_____

[18]Ms. Venters utilized the DSM-IV multiaxial system of diagnosis. The relevant axis and a general description are provided alongside the diagnoses, above.

28

functioning and in maintaining concentration, persistence, or pace, and no episodes of

decompensation of extended duration. (Tr. 365.) However, he found that the evidence did

not establish the presence of the "C" criteria.[19] (Tr. 366.)

Dr. Kupstas additionally completed a Mental Residual Functional Capacity

Assessment on February 4, 2003. (Tr. 369-72, 373-76.) He opined that the plaintiff was

moderately limited in her ability to understand and remember detailed instructions, but

not otherwise significantly limited in understanding and memory. (Tr. 369.) He found that

she was moderately limited in the ability to carry out detailed instructions, maintain

attention and concentration for extended periods, ability to perform activities within a

schedule, maintain regular attendance, and be punctual within customary tolerances, and

in the ability to complete a normal work day and work week without interruptions from

psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods. (Tr. 369-70.) She was not significantly

limited in other areas under the heading of sustained concentration and persistence, such

as the ability to carry out very short and simple instructions. *Id.* Her social interaction was

--------

[19]The "C" criteria for listing 12.04, Affective Disorders, consists of any one of the following: "[r]epeated episodes of decompensation, each of extended duration," or "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate," or "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement."

29

moderately limited in the area of ability to interact appropriately with the general public, but not limited in other areas under this category. (Tr. 370.) All areas under adaptation were not significantly limited. *Id.* In the section for handwritten notes, Dr. Kupstas indicated that the plaintiff was "able to remember and carry out simple instructions" but the rest of his comments are illegible. (Tr. 371.)

An additional Vocational Assessment dated February 4, 2003, also concluded that the plaintiff could perform her past work as a janitor. (Tr. 122-23.) The plaintiff's claim was denied upon reconsideration in a decision dated February 4, 2003. (Tr. 28, 33-34.)

The plaintiff was seen on February 17, 2003, by Dr. Le, reporting no benefit from the right SI joint injections. (Tr. 476.) She complained of right foot pain and exhibited dysesthesia (abnormal sensation) in the dorsal right foot. She exhibited "severe tenderness over the right SI joint." Her range of motion was restricted due to back pain. Dr. Le assessed lumbar degenerative disc disease with possible right L5 radiculitis, as well as a right SI joint dysfunction that responded poorly to a cortisone injection. Dr. Le's treatment plan included right L5 transforaminal epidural steroid injection and continuing on Lortab, Vioxx, and Robaxin.

The plaintiff attended a scheduled therapy appointment at VBHCS on February 18, 2003, with Mr. Bagwell. (Tr. 398.) She presented with a "depressed mood as exhibited by flat affect and monotone speech." She reported continued panic attacks, and Mr. Bagwell

30

discussed coping strategies and provided her with reading materials on panic attacks to be discussed during their next session. *Id.*

The plaintiff returned to counseling with Mr. Bagwell on March 5, 2003, reporting a recurring nightmare for the past three nights, involving being trapped with others and falling in a burning house that is crumbling inward. (Tr. 398.) The plaintiff and Mr. Bagwell discussed her anxiety attacks and coping strategies. He referred her to Alanzo Parker, a therapist in the Gallatin office, "until a therapist [was] hired for Hendersonville." *Id.*

The plaintiff presented to Dr. Le on March 6, 2003, for a right L5 transforaminal epidural steroid injection under fluoroscopic guidance. (Tr. 475, 489.) On March 8, 2003, the plaintiff presented to Dr. Le reporting no response to the right L5 transforaminal epidural steroid injection. (Tr. 474.) She also had anesthetic and cortical steroid injection of the right SI joint with no relief. The plaintiff continued to complain of right low-back pain with radiation down the right lower extremity. Dr. Le assessed that the plaintiff's pain was "intractable," and recommended an L3, 4, and 5 medial branch nerve block on the right hand side with possible facet joint injection or trigger point injections. Dr. Le continued Lortab, Vioxx, and Flexeril. *Id.*

The plaintiff filed a request for a hearing before an ALJ on March 24, 2003. (Tr. 35-36.)

The plaintiff reported to Ms. Venters on March 31, 2003, for a medication follow-up. (Tr. 391.) Ms. Venters reported that the plaintiff was compliant with her medications, but that the plaintiff stated that she continued to have anxiety and depression and the medication increase had not seemed "to have helped at all." The plaintiff denied having any hallucinations or paranoia, and she asked to see another therapist besides Mr. Bagwell.[20] Ms. Venters performed a mental status exam, the results of which showed a depressed mood with a similar affect, coherent speech and logical thought processes, and "fair" hygiene and grooming. The plaintiff's previous DSM diagnosis is repeated, noting "Highest GAF Score (last 12 months) = 050."[21] *Id.* Ms. Venters increased the plaintiff's dosages of Paxil and Atarax and continued her on Seroquel, with a follow-up in four weeks. (Tr. 392.)

The plaintiff presented to Dr. Le for back pain management on April 8, 2003. (Tr. 441, 388.) The plaintiff reported having no response to the right L5 transformainal epidural steroid injection. (Tr. 441.) Dr. Le reviewed her history and noted that she had anesthetic and cortical steroid injection of the right SI joint with no relief. The plaintiff continued to complain of right low-back pain with radiation of the pain down her right leg,

---

[20]It is not clear from the wording of this note or from the record whether or not the plaintiff had a problem with Mr. Bagwell or if something more mundane explained the change, such as Mr. Bagwell obtaining other employment or similar.

[21]This is presumably the DSM diagnosis Ms. Venters rendered on February 3, 2003. (Tr. 394.)

but she did not report any numbness or weakness. The plaintiff exhibited maximum tenderness to palpation on the right iliolumbar junction with pain down the buttock and posterior thigh on the right-hand side. Facet loading test was positive on the right hand side, as was Gaenslen's test (pain on stressing both sacroiliac joints simultaneously). Dr. Le's assessment was of "[i]ntractable right low-back pain with radiation of the pain down the right posterior thigh." He provided differential diagnoses of right SI joint dysfunction, right lumbar facet syndrome, and myofascial pain syndrome. Dr. Le recommended L3, 4, and 5 medial branch nerve blocks on the right hand side. He noted that depending on her response to this, facet joint injection and trigger point injections may be an option. He refilled her prescriptions for Lortab, Vioxx, and Flexeril and recommended follow-up in two weeks. *Id.*

The plaintiff presented to Summit Surgery Center on April 24, 2003, on orders of Dr. Le for purposes of undergoing a diagnostic and therapeutic right L3-5 medial branch nerve block under fluoroscopic guidance. (Tr. 472-73.) The plaintiff tolerated the procedure with no complications. (Tr. 472.)

On May 14, 2003, the plaintiff returned to Dr. Le reporting that the right lumbar medial branch nerve block provided "no relief." (Tr. 471.) She still complained of right low back pain radiating down her right thigh, and that Vioxx gave no relief. Dr. Le

33

planned to try right SI joint injection. He continued the plaintiff on Lortab and Flexeril but discontinued Vioxx. *Id.*

On June 5, 2003, the plaintiff missed a counseling appointment at VBHCS because her therapist cancelled the appointment. (Tr. 397.) On June 26, 2003, the plaintiff cancelled her appointment because she lost Tenn Care. *Id.*

On July 17, 2003, the plaintiff presented to VBHCS for therapy, "depressed," with "teary eyes," and "in significant pain and discomfort." (Tr. 396.) The plaintiff described symptoms of depression, panic attacks, poor sleep, limited exercise due to back trouble, and trouble being around other people. She had not been taking her medication, including for her diabetes and thyroid conditions, due to her loss of Tenn Care, lack of insurance, and lack of money. The plaintiff filled out a Tenn Care state only application and made another appointment with a therapist for the following month. *Id.* The plaintiff did not appear for this appointment, scheduled for August 7, 2003. (Tr. 395.)

The plaintiff reported to Dr. Le on September 19, 2003, reporting back pain radiating down her right leg and that she was out of medications. (Tr. 470.) The plaintiff reported that she lost her insurance and had been unable to come in for the past three months, during which time, she had gone to the emergency room three times for her medications. Dr. Le listed diagnoses of lumbar myofascial pain syndrome, post laminectomy syndrome, lumbago, SI joint dysfunction, degeneration, lumbar/lumbosacral disc, and lumbar facet

syndrome. He planned to resume her pain medications to include Lortab, Relafen, and Flexeril. *Id.* Dr. Le performed trigger point injections for "immediate relief." (Tr. 470, 488.) She was scheduled for right sacral iliac intra-articular joint injections. (Tr. 470.)

The plaintiff was seen by Ms. Evans on September 23, 2003, complaining of an upset stomach and asking for Nexium or Prevacid, and needing refills on all of her medications. (Tr. 446.) The plaintiff reported being off all of her medications for three months due to insurance problems, and that she had been on the Adkins diet, which Ms. Evans cautioned her against due to her diabetes. Ms. Evans ordered blood work and noted diagnoses of GERD, fatigue, hypertension moderately controlled, diabetes uncontrolled, and hypothyroidism. *Id.*

The plaintiff was seen in Dr. Ladd's office on October 8, 2003. Ms. Evans, reported hair loss, fatigue, weight gain and muscle pain. (Tr. 426.) The plaintiff had been off her medications for three months due to her loss of insurance coverage. Diagnoses included severe hypothyroidism, uncontrolled diabetes myelitis, metabolic syndrome, morbid obesity, fatigue, and hair loss. Ms. Evans noted that she should return in one month. *Id.*

Upon referral by Dr. Ladd, the plaintiff underwent a CT of the chest on October 15, 2003. (Tr. 440.) Dr. Tracy Callister read the results of the test and reported mild esophageal reflux, the presence of calcified lymph notes, hypertrophy or cardiomegaly suggested by increased cardiac size, and no plaque seen. However, given the plaintiff's reports of

35

symptoms suggestive of angina, Dr. Callister recommended a treadmill test. Dr. Callister also indicated that echocardiogram might be indicated. *Id.*

Dr. Sharon Stocking also completed a report explaining the CT scan results dated October 15, 2003. (Tr. 436, 449.) Dr. Stocking noted a calcified granuloma in the right lower lobe, linear scar in the middle lobe with a 7 mm uncalcified nodule. She noted calcified lymph nodes, hypertrophic degenerative changes in the dorsal spine, diffuse fatty infiltration of the liver. Dr. Stocking recommended follow up in three months to monitor the stability of the 7 mm nodule. *Id.*

The plaintiff returned to Dr. Le on October 15, 2003, because she was out of medications. (Tr. 469.) Dr. Le reported that the plaintiff had missed her scheduled sacral iliac intra-articular joint injection because her husband was working. She reported no relief with trigger point injections. Dr. Le continued the plaintiff on Lortab, Relafen, and Flexeril, and he rescheduled the sacral iliac injection. *Id.*

The plaintiff presented to VBHCS on October 20, 2003 for a medication follow-up. (Tr. 389.) On this visit, the plaintiff was seen by Traci Turner, MSN, APRN BC.[22] Ms. Turner reported the plaintiff's symptoms as "moderate" anxiety and depression. The plaintiff related that "things [had] been rough," and that her dog had recently died. The

---

[22]The letters after her name denote that Ms. Turner has a Masters of Science in nursing (MSN) and is an Advanced Practical Registered Nurse, Board Certified (APRN BC).

36

plaintiff reported experiencing depression, anxiety, and back pain. The plaintiff felt that Paxil was controlling her mood swings and that the Atarax was "helping some" with anxiety, but that it made her sleepy. The plaintiff also reported visual hallucinations, or that she "sees things occasionally" and had to look again to verify that it was not really there, with the last episode occurring one week before her appointment. The plaintiff stated that she was not sleeping well at night, waking up three to four times and sleeping a total of four hours per night. Ms. Turner increased the plaintiff's medications to help her deal with all of her symptoms: more Paxil to help with depression/anxiety and more Seroquel to help with sleep and visual hallucinations. (Tr. 389-90.) Ms. Turner continued the plaintiff on Atarax, and she recommended that the plaintiff follow-up in six weeks and consider beginning individual therapy. (Tr. 390.) The plaintiff missed her next appointment, scheduled for December 1, 2003. (Tr. 395.)

The plaintiff reported to Summit Surgery Center under the care of Dr. Le for a right sacral iliac joint injection on October 23, 2003. (Tr. 468, 487.)

The plaintiff returned to Ms. Evans on October 29, 2003. (Tr. 425.) The plaintiff had two lesions on her back and decreased flexion/extension of her spine. She was referred to Dr. Ronnie Jackson for a mass in her right middle lobe. Diagnoses included uncontrolled diabetes myelitis, fungal skin lesions on the back, and uncontrolled hypertension. *Id.*

37

The plaintiff returned to Dr. Ladd's office on November 7, 2003, and was seen by an unknown doctor or nurse due to illegible signature. (Tr. 424.) Treatment notes are largely illegible except that the plaintiff presented for a follow up on her blood pressure and diagnoses of diabetes myelitis, hypertension, metabolic syndrome, hypothyroidism and obesity were noted. *Id.*

On November 11, 2003, the plaintiff reported to Dr. Le that she experienced no relief from the right sacral iliac intra-articular joint injection. (Tr. 467.) She also reported insomnia, pain, and depressed mood. In light of the many failed procedures attempted to alleviate her pain, Dr. Le commented that he would "consider chronic pain syndrome." He recommended a trial of an electrical muscle simulator (TENS unit), continued the plaintiff on Lortab, Relafen, and Flexeril, and added Paxil, Topamax (seizures/migraines), and Elavil (antidepressant). *Id.*

The plaintiff returned to Ms. Evans on November 24, 2003, and on December 5, 2003. (Tr. 422-23.) The plaintiff complained of a scaly rash on her back during both visits. *Id.* On the December visit, nurse Evans ordered a thyroid test and other blood tests and prescribed Starlix, a diabetes medication. Although her diabetes was still uncontrolled, nurse Evans noted that the plaintiff's hypertension was "mod[erately]" controlled. She also noted L-5 pain and recommended return in ten days. *Id.*

38

The plaintiff reported to Dr. Le on December 4, 2003, for placement of an electrical stimulation unit. (Tr. 466.) The plaintiff was shown how to use the unit and sent home to use it until otherwise directed. *Id.*

On December 17, 2003, the plaintiff reported to Dr. Le complaining of back/leg pain and out of medications. (Tr. 465.) She reported that the electrical muscle stimulation unit helps. Dr. Le diagnosed chronic pain syndrome in addition to the usual diagnoses, and noted "poor compliance." The plaintiff missed her last appointment but explained that her daughter was sick. Dr. Le told the plaintiff he would not increase her narcotic pain medications if she continued to miss appointments and that she may be released from his care. He increased her Topamax and refilled her other medications. *Id.*

The plaintiff presented to Dr. Le on January 14, 2004, asking to repeat the lumbar epidural steroid injections. (Tr. 464.) She reported that the electrical muscle stimulation unit and Topamax were helping with her pain and muscle spasms, although her pain rating remained the same (6 out of 10). On this visit, Dr. Le noted "psychosocial overlay; chronic pain syndrome" in addition to the plaintiff's other diagnoses. Dr. Le planned a L4-5 and L5-SI transforaminal epidural steroid injection. He increased her Topamax and continued her other prescription medications and the use of the electrical unit. *Id.*

On January 21, 2004, the plaintiff was seen by Ms. Evans in Dr. Ladd's office complaining of right knee pain for one week. (Tr. 421.) Although there was crepitus and

effusion in the right knee, the plaintiff had a full range of motion. Nurse Evans prescribed Prevacid and ordered an x-ray of the right knee. She diagnosed right knee pain, GERD, diabetes, and hypertension. *Id.*

The plaintiff underwent right L4-5 and L5-SI transforaminal epidural steroid injection on January 22, 2004, at Summit Surgery Center, under the care of Dr. Le. (Tr. 463, 486.)

On February 2, 2004, the plaintiff returned to Dr. Ladd's office and was seen by nurse Evans complaining of increased anxiety attacks. (Tr. 420.) The plaintiff reported one to two anxiety attacks per day, with symptoms of feeling weak and hot, having palpitations, and feeling like she was going to pass out. Her sleep was poor and she slept only four to five hours a night, "up and down." She had a firm right sided thyroid tender on palpation and had trouble swallowing. Nurse Evans increased the plaintiff's Starlix, discontinued Paxil and started Zoloft, ordered a right knee X-ray and a CT of her thyroid. *Id.* Her hypertension was once again noted to be "uncontrolled." *Id.*

The plaintiff was admitted to NorthCrest Medical Center on February 3, 2004, upon referral from Dr. Ladd for a neck CT and right knee imaging. (Tr. 433-34.) Dr. Todd Talmadge interpreted the plaintiff's test results, and reported that he could see no discrete thyroid lesion and recommended thyroid ultrasound in follow-up. (Tr. 433.) Dr. Talmadge also noted no pathologically enlarged lymph nodes. *Id.* In looking at the plaintiff's knee

images, Dr. Talmadge noted no large joint effusion, minimal tibiofemoral degeneration and minimal spurring around the medial tibiofemoral joint and possible mild aburnation. (Tr. 434, 447.)  There was no fracture, abnormal alignment, or other dominant focal bony abnormality.  Dr. Talmadge diagnosed minimal degenerative disease.  *Id.*

On February 13, 2004, the plaintiff returned to Dr. Ladd's office and was seen by nurse Evans for follow-up.  (Tr. 419.)  Nurse Evans ordered blood tests, gave Prevacid samples, increased the plaintiff's dosage of Levoxyl (thyroid), and noted that the plaintiff's diabetes was moderately controlled.  *Id.*

The plaintiff returned to VBHCS on February 16, 2004, and she was again seen by nurse Traci Turner.  (Tr. 386-87.)  Ms. Turner reported that the plaintiff's psychosis had been resolved but that her anxiety/panic remained moderate.  (Tr. 386.)  The plaintiff reported daily panic attacks and bad dreams, and that things were "hard for her to deal with lately."  Ms. Turner stated that the plaintiff was "having some depression."  The plaintiff reported getting Paxil from her primary care physician, but at a lower dose than that prescribed by Ms. Turner.  Ms. Turner increased the dosage of Paxil and discussed starting Buspar for anxiety and panic.  The plaintiff reported that her sleep was "some better" since increasing Seroquel.  The plaintiff was put on diovan and HCTZ for high blood pressure.  *Id.*  Ms. Turner continued the plaintiff on the increased dose of Paxil, continued Atarax, increased dose of Seroquel, began Buspar, and recommended follow-up

in six weeks. (Tr. 387.) Ms. Turner also stated that she would refer the plaintiff for individual therapy. *Id.*

The plaintiff underwent another right L4-5 and L5-SI transforaminal epidural steroid injection with Dr. Le on February 16, 2004. (Tr. 461, 462, 484.)

The plaintiff underwent an ultrasound on her thyroid on March 5, 2004. (Tr. 430, 450.) Dr. David Watts interpreted the plaintiff's results, noting that the thyroid lobes were "small and difficult to visualize," but that there was a 1.4 cm solid nodule in the left thyroid lobe. He recommended needle biopsy or follow-up in three months. *Id.*

The plaintiff returned to nurse Evans on March 8, 2004. Examination revealed that plaintiff's back was, tender at the L-5 point. (Tr. 418.) Nurse Evans started the plaintiff on Crestor and ordered a spine x-ray and a dermatological referral for an ongoing skin problem on the plaintiff's back, diagnosed as psoriasis. Nurse Evans noted that the plaintiff's diabetes remained moderately controlled, but that her hypertension was uncontrolled. *Id.*

On March 12, 2004, the plaintiff returned to Dr. Le complaining of increased low back pain. (Tr. 460.) The plaintiff reported that she was doing well after the steroid injections until she developed a urinary tract infection and was currently on antibiotics. She was still experiencing low back and leg pain, rated at a 5 out of 10. Dr. Le administered

42

trigger point injections to affected areas (Tr. 482-83), increased the plaintiff's Lortab and Topamax and continued prior medications. (Tr. 460.)

On March 15, 2004, nurse Evans noted that the plaintiff did not have the spinal x-ray and ordered this, along with an MRI of the right knee. (Tr. 417.) She increased Diovan (for high blood pressure) and discontinued Pravachol but gave Crestor (cholesterol medications) samples. She indicated diagnoses of degenerative joint disease of the right knee, L-5 back pain, and hypercholesteremia. *Id.*

On March 16, 2004, the plaintiff returned to NorthCrest for three views of her lumbosacral spine as indicated by her chronic low back pain, as well as an MRI on her right knee due to degenerative joint disease. (Tr. 432, 429.) Dr. Spencer Madell interpreted her test results. *Id.* Dr. Maddel noted possible "very small knee joint effusion," but no bony lesions or evidence of significant meniscal tear. (Tr. 429.) Ligaments were intact and no soft tissue masses or fluid collections were present. *Id.* With respect to her spinal view, Dr. Maddel noted some mild straightening of the normal lumbar lordosis, but no fracture, subluxation, or focal bony lesions. He noted some mild disk space narrowing at L4-5, as well as mild hypertrophic spurring at L4-5. He diagnosed mild degenerative changes at L4-5 with no acute abnormalities present. *Id.*

The plaintiff returned to Dr. Le on March 26, 2004, with no new complaints and pain "stable" at 5 out of 10. (Tr. 459.) She reported that trigger point injections to affected areas

43

lasted about one week. Dr. Le continued prior medications. *Id.* Dr. Le performed two trigger point injections to the left thoracic paraspinals and the lumbar paraspinals. (Tr. 481.)

The plaintiff cancelled her individual therapy appointment scheduled for March 16, 2004,[23] but reported for therapy on March 29, 2004, with Kimberly Agoston. (Tr. 385.) Ms. Agoston reported that the plaintiff presented with a sad affect, "crying while talking about past abuse." During the visit, Ms. Agoston collected background information and attempted to establish a rapport. The plaintiff stated that she would like to work on decreasing her panic attacks and anxiety. The plaintiff reported having three panic attacks per week, consisting of shaking, feeling like she cannot breath, and sweating. The plaintiff reported that the attacks have gotten worse in the past month, especially while driving. Ms. Agoston gave the plaintiff reading materials on panic attacks and told the plaintiff that if she missed two appointments she would not be rescheduled for therapy. *Id.*

The plaintiff also saw Ms. Turner on March 29, 2004, for a medication follow-up. (Tr. 383-84.) The plaintiff reported that things were "okay," and the "same as usual," and that she had "some depression" and did not feel that the Buspar was helping with her anxiety. (Tr. 383.) The plaintiff continued to report anxiety and panic attacks, two to three times per week, even while driving. Ms. Turner suggested starting Effexor, but the plaintiff

_____

[23]The plaintiff reported to NorthCrest Medical Center for knee MRI and lumbosacral views on this date. (Tr. 432.)

declined due to concerns about her blood pressure. The plaintiff stated that she had tried Zoloft in the past but experienced side effects. Ms. Turner also suggested Texapro but the plaintiff preferred to stay on Paxil "for now." The plaintiff reported not sleeping very well and Ms. Turner suggested taking two Seroquel at bedtime. The plaintiff related that her doctor put her on Topamax for her back pain and that she was having a biopsy on a thyroid nodule. *Id.* Ms. Turner increased the plaintiff's Buspar, continued her on Paxil and Seroquel, but discontinued Atarax because the plaintiff was not taking it. (Tr. 384.) Ms. Turner recommended follow up in eight weeks and continuation of individual therapy. *Id.*

A treatment note from Springfield Surgery, P.C., indicated that the plaintiff presented for an office visit relating to her thyroid mass and saw Dr. Daniel Davis on April 8, 2004.[24] (Tr. 428.) She reported an attempted Radiology guided biopsy of the nodule in her thyroid that was unsuccessful. Her left thyroid was palpably larger than her right. Dr. Davis recommended that she have a nuclear thyroid scan to see if the nodule was "active," and if it was not, she would need a hemi-thyroidactomy to rule out cancer. The plaintiff agreed to a thyroid scan.

The plaintiff returned to VBHCS for an individual therapy appointment with Ms. Agoston on April 12, 2004. (Tr. 382.) Ms. Agoston reported that the plaintiff presented

---

[24]The Court presumes that the plaintiff saw Dr. Davis based on the initials "D.D." at the bottom of the patient's treatment notes from that day. (Tr. 428.)

with a "blunted" affect and reported that she had not finished reading the materials she was given at the last appointment. The plaintiff and Ms. Agoston discussed her panic attacks and coping skills such as breathing techniques. The plaintiff did not show up for her next appointment, scheduled for April 26, 2004. *Id.*

The plaintiff reported to Dr. Le on April 15, 2004, reporting a transient (temporary) response to trigger point injections and rated her pain at a 6-7 out of 10. (Tr. 458.) The plaintiff also returned an abnormal drug screen.[25] Dr. Le noted "chronic pain syndrome; poor compliance with pain management agreement; poor response to multiple intervention; not a candidate for narcotic pain therapy for abnormal urine drug screen." *Id.*

On April 15, 2004, the plaintiff presented to NorthCrest for an MRI on her lumbar spine due to her recurrent post-operative pain and radiculopathy. (Tr. 427.) Dr. Madell interpreted her results, noting that the images were somewhat hard to read due to patient motion. He noted normal bone alignment, that the vertebral body heights were preserved, and that the plaintiff is post right hemilaminectomy at L4 and L5. He recorded minimal disc space narrowing at L4-5, degeneration of the disks at L4-5 and L5-SI, as well as mild

---

[25]The results of the drug screen are contained in the record, but it is not clear why the plaintiff's results were "abnormal." (Tr. 480.) The plaintiff's urine was negative for "recreational" drugs such as amphetamines, barbiturates, cocaine, etc., but also negative for hydrocodone and hydromorphone, and these results are circled. *Id.* The ALJ indicated that these results signified non-compliance with taking her prescribed pain medications. (Tr. 20.)

46

scarring in a right paramedian location at the L4-5 level, which may involve the right L5 nerve root. There was no focal disk herniation or protrusion at any level and no significant spinal stenosis. Dr. Madell emphasized that there might be right L5 nerve root involvement as it exits the neural foramina and recommended clinical correlation. *Id.*

The plaintiff presented to Ms. Evans on May 5, 2004. (Tr. 415.) The plaintiff requested a referral to Dr. Bartholomew at a pain clinic, was given samples of Nexium, and was diagnosed with chronic pain syndrome, hyperlipidemia, hyptertension that was moderately controlled and GERD. Her chart also noted upcoming thyroid surgery on May 19, 2004, at NorthCrest. *Id.*

The plaintiff reported to VBHCS and Ms. Turner for a medication follow-up on June 28, 2004. (Tr. 380-81.) The plaintiff's symptoms included anxiety/panic attacks listed as "moderate" and depression listed as "moderate." The plaintiff reported that things were "not too good." The plaintiff reported losing Tenn Care and not being sure if she was covered now. The plaintiff reported a more depressed mood with these stressors. The plaintiff still did not feel like the Buspar was helping with anxiety, and Ms. Turner again suggested added Effexor. Physically, the plaintiff reported that she was sleeping better, and that her appetite had decreased but she had not lost weight. The plaintiff reported recently undergoing thyroid surgery and still recovering. *Id.* Ms. Turner gave the plaintiff samples for her medications, including Paxil and Seroquel. (Tr. 380-81.) Ms. Turner

47

discontinued Buspar and started the plaintiff on Effexor, recommending follow-up in five weeks and continuing with therapy. (Tr. 381.)

The plaintiff returned to Ms. Evans on July 9, 2004, seeking refills of some of her prescription drugs and requesting an x-ray for her left hand. (Tr. 414.) She was diagnosed with a fracture of the left thumb, hypothyroidism, L-5 disc bulge, and pain management. *Id.*

The plaintiff presented to Dr. Haregewain Soloman on July 22, 2004. (Tr. 496-502.) Dr. Soloman performed a patient evaluation, taking an extensive history including her history of back and leg pain worse with walking, bending, and sitting for a long time, diabetes, hypertension, and back surgery. (Tr. 496.) Dr. Soloman noted that she rated her pain a six out of ten, and that she had attended a pain clinic but stopped going because "it was far to drive." *Id.* Dr. Soloman noted that her distress was "severe" secondary to pain, that she had mid and low back and right hip and thigh pain with palpation. (Tr. 497.) Dr. Soloman noted that her left hand was tender and her range of motion was mildly restricted. (Tr. 499.) Dr. Soloman noted tenderness in the spinous processes L1-SI, paraspinal lumbar muscles, gluteal muscles, and noted spasm of these latter two. (Tr. 500.) Dr. Soloman indicated that her range of motion of the lumbosacral spine was restricted on flexion. Pain was increased on weight bearing in the lower extremities with right buttock and quadriceps tenderness and slightly restricted range of motion in the upper leg. *Id.*

48

Dr. Soloman assessed lower back pain, radiculopathy, and obesity, prescribed Lortab, and requested MRI records. (Tr. 502.) She advised the plaintiff to lose weight. *Id.*

On August 23, 2004, the plaintiff reported to VBHCS and Ms. Turner. (Tr. 378-79.) The plaintiff reported that she still did not have Tenn Care, that her memory had not been as good lately, and that Effexor made her feel jittery and sick at a higher dose, and that she stopped taking it. (Tr. 378.) The plaintiff reported that her panic attacks were not better. Ms. Turner suggested adding Wellbutrin XL to help with depression, and potentially adding Klonopin once Tenn Care was reinstated. The plaintiff reported having bad dreams that interfered with her sleep, and that she had recently been to the hospital for her back pain. *Id.* On this visit, the plaintiff's level of functioning was listed as slightly improved. (Tr. 379.) Ms. Turner continued the plaintiff on Paxil and Seroquel and started her on Wellbutrin XL. She recommended follow-up with Dr. Beasley. *Id.*

The plaintiff returned to Dr. Soloman on August 26, 2004, complaining of "both legs" and lower back pain. (Tr. 494.) She rated her pain at a 7 out of 10 and noted that prolonged walking made it worse. Dr. Soloman noted lower lumbar tenderness. She recommended increasing dosage of Lortab and a neurosurgical reevaluation, and again advised the plaintiff to lose weight. *Id.*

On September 9, 2004, the plaintiff was seen by Dr. Ladd to have "paperwork filled out." (Tr. 444.) Dr. Ladd filled out a Medical Source Statement for the plaintiff dated the

49

same day. (Tr. 451-56.) He stated that he had seen the patient one time, although treatment records indicate that the plaintiff had been treated in his office extensively, often by nurse practitioners, dating as far back as June 26, 2002. (Tr. 347-54, 413-50.) Dr. Ladd saw the plaintiff himself on at least one visit on December 5, 2002. (Tr. 349.) Dr. Ladd listed the plaintiff's diagnoses as lumbar radiculopathy and sciatica, and indicated that her prognosis was "poor." (Tr. 452.) He identified her symptoms as including: fatigue, difficulty walking, episodic vision blurriness, rapid heart beat/chest pain, general malaise, muscle weakness, psychological problem, abdominal pain, extremity pain and numbness, dizziness/loss of balance, and headaches. He listed clinical findings including "[p]hysical changes consistent [with] previous back and abd[ominal] surgery - obesity - weakness."

Dr. Ladd opined that her impairments have lasted or could be expected to last twelve months. *Id.* Dr. Ladd indicated that emotional factors contributed to the severity of the plaintiff's symptoms, and that she suffered from depression and anxiety. (Tr. 452-53.) He opined that she would experience pain or other symptoms severe enough to interfere with attention and concentration frequently, and that she would be "[i]ncapable of even 'low stress' jobs." (Tr. 453.) He indicated that she could walk one city block without rest or severe pain, that she could sit for thirty minutes at one time, and stand for twenty minutes at a time. (Tr. 453-54.) She could stand/walk for about four hours total in an eight hour work day, and sit for the same length of time. (Tr. 454.) The plaintiff would

50

need to include periods of walking during an eight-hour workday, every fifteen minutes, for ten minutes at a time, and she required a job that would allow shifting positions at will as well as unscheduled breaks. He estimated that these breaks would need to occur weekly, and that the plaintiff would need to rest by sitting quietly about thirty minutes before returning to work. Dr. Ladd indicated that the plaintiff's legs would need to be elevated two feet with prolonged sitting, and that this would need to be done for about two hours in an eight hour day. *Id.*

Dr. Ladd indicated that the plaintiff could lift/carry less than ten pounds frequently, ten pounds occasionally, twenty pounds rarely, and fifty pounds never. (Tr. 455.) She could never twist, rarely crouch/squat, and occasionally stoop (bend) and climb stairs. Dr. Ladd indicated no limitations in reaching, handling, or fingering. He indicated that she should avoid concentrated exposure to extreme cold, heat, high humidity, soldering fluxes, solvents/cleaners, fumes, odors, gases, dust, and chemicals, that she should avoid even moderate exposure to cigarette smoke, and that there were no restrictions with respect to wetness or perfumes. *Id.* Dr. Ladd opined that the plaintiff's impairments would produce good days and bad days, and that she was likely to be absent from work more than four days per month. (Tr. 456.)

A hearing was held before an ALJ on September 30, 2004. (Tr. 653-79.)

51

The plaintiff underwent an MRI of the lower spine on October 6, 2004, as ordered by Dr. Avis D. Walters, a family practitioner at Medical Necessities. (Tr. 506.) The results of this MRI were compared with results from April 15, 2004. (Tr. 507.) The radiologist, Dr. Jeffrey Brannick, noted loss of T2 signal at L4-5 and L5-SI, as well as right laminotomy changes at L4-5. Preexisting and minimal bulging at L4-5 was unchanged. Dr. Brannick noted a very small central disk protrusion at L5-SI with increased T2 signal suggestive of an annular tear. No nerve root impingement was seen. Dr. Brannick diagnosed "very mild degenerative and postsurgical changes of the lower lumbar region," as well as a tiny L5-SI disc protrusion "with evidence of focal annular tear," and continued presence of minimal L4-5 disc bulge. *Id.*

Dr. Walters completed a Medical Source Statement of Ability to do Work-Related Activities on October 27, 2004. (Tr. 510-12.) Dr. Walters indicated that she saw the plaintiff in July 2004. (Tr. 510.) She listed diagnoses of lumbar laminectomy, persistent lumbar radiculopthy, bilateral carpal tunnel syndrome, hypothyroid, diabetes, hypertension, and depression. Dr. Walters listed the plaintiff's symptoms as chronic pain daily at a 7-8 out of 10 with medications and 9 out of 10 without medications, and burning pain in her feet and lower extremities. She also noted "pain in low back, aching, throbbing radiates down both legs constant/burning pain both feet." Dr. Walters listed side effects as dizziness and nausea. She indicated that the plaintiff's impairments lasted or could be expected to last

52

twelve months and that she was not a malingerer. Dr. Walters reported that the plaintiff's pain would consonantly interfere with her attention and concentration, and that her dizziness would occasionally do so. Dr. Walters indicated that the plaintiff was incapable of even "low stress" jobs due to "multiple physical and emotional-psychological issues as noted above." *Id.*

Dr. Walters indicated that the plaintiff could walk less than one block without rest or severe pain, that she could stand for ten minutes, sit for five minutes, stand/walk less than two hours in an eight-hour day, sit less than two hours in an eight-hour day, and that she would need a job that would permit shifting positions at will and she would need to include periods of walking during an eight-hour day. (Tr. 511.) She would need to walk for one to three minutes every five to ten minutes and she would require unscheduled breaks during an eight-hour shift, probably more than six times in one hour. Dr. Walters indicated that the plaintiff would need to have her legs elevated for ten percent of an eight-hour workday if she had a sedentary job. *Id.* Dr. Walters opined that the plaintiff would need a cane or other device to stand/walk. (Tr. 512.) She reported that the plaintiff could lift/carry less than ten pounds occasionally. She limited climbing stairs to rarely and stooping, crouching, crawling, and climbing ladders were ruled out altogether. Dr. Walters indicated that the plaintiff would have good days and bad days, and that the plaintiff

would likely have to be absent from work more than four days per month. Dr. Walters indicated onset of symptoms and limitations in February 2002. *Id.*

### B. Hearing Testimony: The Plaintiff and a Vocational Expert

A hearing was held on September 30, 2004, before ALJ Linda Gail Roberts. (Tr. 653-79.) The plaintiff testified and was represented by counsel, and Dr. Kenneth Anchor, VE, testified at the hearing.

The plaintiff testified that she was born on August 30, 1964, and that she was forty years old at the date of the hearing. (Tr. 657.) She completed the twelfth grade and did not take any special education classes. *Id.* The plaintiff confirmed that her onset date was January 14, 2002. (Tr. 657-58.)

The plaintiff recounted her past work as a cashier from 1988-1989 (Tr. 658), and as a custodian from 1999-2000 (Tr. 659). In the ten year interim between these jobs, the plaintiff testified that she was a stay at home mother to her children. (Tr. 659.) The plaintiff testified that these two jobs were her only past employment.

The plaintiff testified that her impairments included back problems, diabetes, nerve problems, panic attacks, and thyroid problems. *Id.* The plaintiff testified that she had back surgery in May 2002 for a bulging disc.[26] (Tr. 660.) At this point in the hearing, the ALJ

--------------------------------

[26]The surgery was actually in April 2002. (Tr. 305.)

Case 3:06-cv-00728   Document 14   Filed 03/31/08   Page 54 of 76 PageID #: 110

noted that the plaintiff "seem[ed] to be having [] difficulty," with her back because she had to move around during her testimony. The plaintiff testified that since her surgery, her pain was about the same on the right side but now she had "another bulging disc" on the left side and the pain from that also radiated down her leg. The plaintiff was scheduled to have another MRI on her left side, as well as nerve testing on her hands. *Id.*

The plaintiff was seeing Dr. Walters at the time of the hearing, and had seen her once before, as well as her colleague, Dr. Soloman, whom the plaintiff had been seeing for about a month and a half. (Tr. 661, 663.) Dr. Walters prescribed a cane for the plaintiff and ordered an MRI in order to complete a Medical Source Statement. *Id.* The ALJ stated that she would give the plaintiff's attorney sixty days to submit the Medical Source Statement from Dr. Walters. (Tr. 662.)

The plaintiff related that she had been seeing Dr. Le for about two years for pain management. (Tr. 663.) She testified that Dr. Walters was now handling her pain management, in addition to Dr. Ladd. (Tr. 664.) The plaintiff testified that she had been seeing Dr. Sharva Evans, a family physician "underneath Dr. Ladd," for three or four years. *Id.*

The plaintiff testified that she is five feet three inches tall and weighs 250 pounds, and has gained about thirty pounds due to her inability to be active. (Tr. 665.) The plaintiff testified that she could sit for about five minutes before she needed to stand up due to pain,

and that she could stand for about ten minutes. Sitting caused more pain than standing. She estimated that she could walk about ten minutes before pain made her stop. *Id.* The plaintiff stated that she could lift a gallon of milk, weighing about eight pounds, but that she could not lift more than this. (Tr. 665-66.)

The plaintiff related that she has four children, aged 21, 15, 12, and 9. (Tr. 666.) She testified that she "can't hardly do nothing that [she] use to do," since her injury. *Id.* She stated that her husband and daughter cook and the other children help cleaning the house, but that she does not do any cleaning. (Tr. 667.) The plaintiff testified that she "deal[s] with the pain," all day. She stated that she was able to drive short distances, two to three miles to the grocery store, and that she sometimes does her own shopping. *Id.*

The plaintiff testified that she could be on her feet, either standing or walking, for about an hour and thirty minutes or two hours total in an eight hour day. (Tr. 668.) To relieve the pain of sitting, the plaintiff would alternate sitting, walking, or lying down on her side. She testified that her energy level was "bad," and that she did not sleep well at night or feel rested in the morning. *Id.* She usually napped during the day for about one to two hours. (Tr. 669.) She testified that some of her medications made her sleepy.

The plaintiff discussed her panic attacks, saying that they were "bad,"day to day and that she has not really experienced any relief since she has been in treatment for them. She has also been experiencing problems with her hands, dropping things unexpectedly

56

without even realizing it. *Id.* She described the pain in her legs and back as a dull pain going down her back with numbness in both feet. (Tr. 669-70.)

The plaintiff's attorney informed the ALJ that a workers' compensation settlement was "pending," arising out of her injury. (Tr. 670.)

Dr. Anchor, VE, asked the plaintiff if she had ever been a supervisor at any of her jobs, and she answered in the negative. (Tr. 671.) Dr. Anchor testified that the plaintiff was a younger worker with a high school education. Her past work as a cashier was classified as light and semi-skilled, and her work as a school custodian was medium and semi-skilled. (Tr. 671-72.)

The ALJ asked Dr. Anchor to consider a pain impairment based upon the RFC in Exhibit 17F, the Medical Source Statement completed by Dr. Ladd on September 9, 2004. (Tr. 672.) Dr. Anchor opined that this profile would not allow for return to past work and that there were no jobs that a person with those limitations could perform under that RFC on a full time basis.

The ALJ next asked Dr. Anchor to consider a hypothetical person based upon Exhibit 12F, the psychiatric review technique form completed by Dr. Kupstas on February 4, 2003. Considering the first fourteen pages of the exhibit, Dr. Anchor testified that past work could be performed. *Id.* Considering the last three pages of the exhibit, the

57

mental RFC, the hypothetical person could also return to past work with those limitations. (Tr. 672-73.)

The ALJ asked a fourth hypothetical question based on the physical RFC contained in Exhibit 9F, the RFC completed by Dr. Schull. (Tr. 673.) The VE testified that this exhibit described medium work and would also allow for light work, and that based upon that exhibit, the plaintiff could return to her past work.

The ALJ asked a further hypothetical based on Exhibit 7F, the psychological evaluation completed by Dr. Yarbrough. The VE testified that this exhibit would allow for past work as a school custodian but not a cashier because the assessed Global Assessment of Functioning (GAF) score of 50 would "not allow for work dealing with the public."[27] *Id.* A borderline range of intelligence would also make work as a cashier difficult. (Tr. 673-74.) Depression and impairment in concentration and short term memory would also preclude functioning as a cashier. (Tr. 674.)

If the plaintiff could return to a full range of light work, the VE opined that her past work as a cashier would be available but not work as a school custodian. Light work with a sit/stand option would allow for a return to work as a cashier. Based upon a full range of sedentary work, the plaintiff could not return to her past relevant work, but there would

_____

[27]The court reporter transcribed "load assessment of functioning," but clearly is the reference to the Global Assessment of Functioning score contained in Dr. Yarbrough's report. (Tr. 673.)

58

be other jobs that she could perform. *Id.* Examples of sedentary work included pricing clerk, table worker, small parts assembler, and electronics tester. (Tr. 675.) The VE testified that there are thousands of these jobs at the state level and hundreds of thousands at the national level. (Tr.675-76.)

Finally, the VE testified that a person of the plaintiff's age, education, work history, transferable skills, impairment and pain as described in her testimony would be precluded from full-time work on a sustained basis provided her difficulties were at the severe level with their intensity, frequency, and duration. (Tr. 676.)

The ALJ noted that exhibit 17F, the Medical Source Statement from Dr. Ladd, did not "match the rest of the file," and she encouraged the plaintiff's attorney to submit a Medical Source Statement from Dr. Walters and Dr. Evans. (Tr. 677.)

The record was reopened on December 8, 2005, to enter Exhibit 19F, treatment notes from Dr. Soloman, Exhibit 20F, MRI of the lumbar spine, and Exhibit 21F, the medical source statement of Dr. Walters, into the file. (Tr. 679.)

The ALJ wrote to Dr. Anchor on November 19, 2004, enclosing the Medical Source Statement completed by Dr. Walters, and asking him to render an opinion based on the new evidence. (Tr. 126.) Dr. Anchor completed his assessment on January 12, 2005, and concluded that the limitations contained in Dr. Walters' October 27, 2004, Medical Source

Statement, would not allow the plaintiff to return to her past work or perform other jobs. (Tr. 127-29.)

The ALJ again wrote to Dr. Anchor on April 5, 2005, requesting that the VE examine the RFC assessment completed by Dr. Schull on September 14, 2002 (Tr. 338-45), as well as the mental RFC assessment completed by Dr. Kupstas on February 4, 2003 (Tr. 369-71). Dr. Anchor first concluded that these assessments would direct that the plaintiff could NOT return to her past work, noting "weekly panic attacks as per 12F," and he also indicated that there were no other jobs which she could perform. (Tr. 142.) It appears that the reason that Dr. Anchor had to change this assessment was because the plaintiff's recurrent panic attacks were listed in psychiatric review technique form (Tr. 360), which was also completed by Dr. Kupstas on the same day as the mental RFC, but which portion of Dr. Kupstas' opinion the ALJ specifically directed the VE to ignore when answering the hypothetical. (Tr. 142, "the MRFC in Exhibit 12F," as opposed to the entirety of 12F, which would have included the psychiatric review technique form.) Ultimately, Dr. Anchor scratched through his original answers and concluded on May 18, 2005, that according to Exhibit 9F and a selected portion of 12F, the plaintiff could return to her past work. (Tr. 142..)

## III.  THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on July 5, 2005.  (Tr. 17-22.)  Based on the record, the ALJ made the following findings.  (Tr. 21-22.)

1. The claimant has not engaged in substantial gainful activity since May 21, 2002.

2. The claimant's "severe" impairments have been morbid obesity, lumbar degenerative disc disease with the residuals of a discectomy and foraminectomy at L4-5, major depression, and a panic disorder, but she has not had an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

3. As discussed above, the claimant's testimony could not be found fully credible.

4. The claimant could perform the residual functional capacity described above.  20 CFR § 416.945.

5. The claimant could perform her past relevant work as a school custodian with the above allowances per the vocational expert's testimony.  20 CFR § 416.965.

6. The claimant's impairments have not prevented her from performing her past relevant work.

7. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision.  20 CFR § 416.920(e).

Case 3:06-cv-00728   Document 14   Filed 03/31/08   Page 61 of 76 PageID #: 117

The plaintiff filed a request for review of the hearing decision on August 4, 2005.

(Tr. 10-15.)  The Appeals Council denied the plaintiff's request for review on June 8, 2006.

(Tr. 6-9.)

## IV.  DISCUSSION

### A.  Standard of Review

The determination of disability under the Act is an administrative decision, and the

only questions before this Court are whether the decision of the Commissioner is

supported by substantial evidence and whether the Commissioner employed the proper

legal standards in reaching his conclusion.  42 U.S.C.A. § 405(g).  *See Richardson v. Perales*,

402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial

evidence standard in context of Social Security cases).  The Commissioner's decision must

be affirmed if it is supported by substantial evidence, even if the evidence could also

support another conclusion.  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402

U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126

(1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit

opinions adopting language substantially similar to that in *Richardson*).  A reviewing court

may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do

63

basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C.§ 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results

64

in an automatic finding of disability.  *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled.  *Id.*  The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant.  *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989).  If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy.  *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances).  It remains the plaintiff's burden to prove the extent of her functional limitations.  *Her*, 203 F.3d at 391.  Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national

economy that the plaintiff can perform, she is not disabled.[28]  *Id.  See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further.  20 C.F.R. § 404.1520(a)(4).  *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step four of the five-step process. (Tr. 22.)  At step one, the ALJ found that the plaintiff successfully demonstrated that he had not engaged in substantial gainful activity since the alleged onset date of disability of May 21, 2002.  (Tr. 21.)  At step two, the ALJ found that the plaintiff suffered from the severe impairments of morbid obesity, lumbar degenerative disc disease with the residual of a discectomy and foraminotomy at L4-5, major depression and a panic disorder.  At step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal

---

[28]This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied.  *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

66

one of the listed impairments in Appendix 1, Suppart P, Regulation No. 4. *Id.* At step four, the ALJ found that the plaintiff had the residual functional capacity to perform medium work with some limitations, and that she could perform her past relevant work. *Id.* Therefore, the case was resolved at step four and the ALJ did not go on to step five of the sequential evaluation process.

### C. The Plaintiff's Assertions of Error

The plaintiff alleges that the ALJ erred by not giving proper weight to the opinion of her treating physician, Dr. Ladd. *See* Docket Entry No. 11, at 9, 11. The plaintiff further alleges that the ALJ erred by failing to evaluate the effects of the plaintiff's obesity. *Id.* at 9. Finally, the plaintiff alleges that the ALJ erred in rejecting the opinion of Dr. Yarbrough and accepting the opinions of the non-treating, non-examining DDS consultant. *Id.*

### 1. The ALJ erred in evaluating the medical evidence of record.

The plaintiff alleges that the ALJ erred in assessing the medical evidence of record; specifically, the plaintiff objects to the ALJ's failure to credit the medical source statement provided by Dr. Ladd (Tr. 452-56). The ALJ rejected the opinion of Dr. Ladd, a treating source, and she ultimately adopted the opinion provided by non-examining, consultative, DDS examiner, Dr. Schull. (Tr. 20-21.)

Although there are many standards to which the ALJ must adhere in assessing medical evidence supplied in support of a claim, generally speaking, greater deference is usually given to the opinions of treating physicians than to those of non-treating physicians. *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). This is commonly called the treating physician rule. *Id.* (citing other authority). Due to the nature of the treating physician relationship, these physicians are thought to supply "a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." 20 C.F.R. § 416.927(d)(2). The opinion of the treating physician as to the nature and severity of the plaintiff's impairments will be accorded controlling weight so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and "not inconsistent with other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Although the ALJ is not always bound by the opinions and assessments of treating physicians, he must nonetheless consider and weigh them, and give reasons for rejecting them. *See generally Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) (discussing the treating source rule). Social Security regulations and well-settled case law require the agency to "give good reasons" for disregarding the medical opinion of a treating physician. 20 C.F.R.§ 404.1527(d)(2); *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

68

Here, the ALJ considered the opinion submitted by Dr. Ladd (Tr.20), which described physical limitations so severe that the VE opined at the plaintiff's hearing that a person with those limitations could not perform past relevant work or any other full-time work. (Tr. 672.) In her opinion, the ALJ awarded less weight to Dr. Ladd's assessment because Dr. Ladd "did not address [Dr. Le's] concerns about why the [plaintiff] was not taking her pain medication despite reporting severe pain." (Tr. 21.) The ALJ also took issue with Dr. Ladd's failure to "address" the plaintiff's failure to "see Dr. Uteg as directed." *Id*. The ALJ also made reference to the fact that the plaintiff was often seen by Dr. Ladd's nurse practitioner, Ms. Evans. (Tr. 20, 21.) The ALJ then summarily concluded that Dr. Schull's assessment, based merely on a review of medical records and representing a "prediction" some seven months into the future, was entitled to more weight.[29] (Tr. 21.)

The ALJ is required to "give good reasons" for rejecting the opinion of a treating source. Here, the ALJ failed to do so with respect to the opinion of Dr. Ladd. As an initial matter, it is true that the plaintiff was frequently seen by Ms. Evans, a nurse practitioner

_____

[29]Dr. Schull performed his review of the medical records and completed his assessment in September 2002, but he indicated that his assessment was for a date "12 Months After Onset: 4/03." (Tr. 338.) The Court notes that twelve months after the plaintiff's onset date of January 14, 2002, would be January 2003 and not April 2003. However, Dr. Schull may have mistakenly calculated her date of onset in April 2002, the month and year of her back surgery. The Court also notes that Dr. Schull's assessment was "predictive" in nature, rather than a current evaluation of her limitations based on the medical evidence available to him.

69

in Dr. Ladd's office, or sometimes another nurse practitioner or doctor in the office.[30]

However, the plaintiff was seen by Dr. Ladd himself on at least one occasion (Tr. 349), and

he would have been ultimately responsible for supervising the nurse practitioner and

overseeing the care of the patients in his practice at all times. The doctor/nurse practitioner

collaboration is increasingly common, and a situation in which a patient's regular care was

overseen first by a nurse practitioner and ultimately by the doctor himself when warranted

does not remove that doctor from the position of a treating source. The plaintiff had a very

long and detailed treating relationship with Dr. Ladd's office, and Dr. Ladd qualifies as a

treating source.

The ALJ's remaining reasons for discrediting the opinion of Dr. Ladd essentially

related to Dr. Ladd's failure to "supervise" the plaintiff's care with respect to her treatment

by other physicians. The ALJ complained that Dr. Ladd did not address Dr. Le's concern

about a negative urine screen or the plaintiff's failure to see to Dr. Uteg. (Tr. 21.)

Dr. Uteg was the plaintiff's neurosurgeon, and he performed back surgery on

April 8, 2002. (Tr. 214.) The plaintiff returned to Dr. Uteg on at least five occasions, post-

operatively, between April 18, 2002, and June 20, 2002. (Tr. 300-05.) During the plaintiff's

last visit with Dr. Uteg, she was still experiencing pain symptoms, and six days later, on

---

[30]At times, the signatures on the plaintiff's treatment notes provided by Dr. Ladd's office are illegible, so it is impossible to say with certainty who completed her chart that particular day.

June 26, 2002, she began seeing Dr. Ladd.[31]  (Tr. 300, 354.)  There is no indication that she in any way failed to see Dr. Uteg as directed, because at that point, further surgery was not indicated and Dr. Ladd had taken over her primary care.  It hardly would have been Dr. Ladd's responsibility to ensure that the plaintiff continue to see her neurosurgeon. Ultimately, such a failure to enforce follow-up would not amount to a "good reason" to discredit Dr. Ladd's medical findings and professional opinions contained in his written assessment and supported by the plaintiff's treatment records with his office.

Likewise, Dr. Ladd did not err with respect to his response to the plaintiff's treatment by Dr. Le.  On April 15, 2004, Dr. Le wrote a "Physician Follow-Up Letter" that is copied to Dr. Ladd.  (Tr. 458.)  Dr. Le's letter reflects that the plaintiff suffered from, *inter alia*, chronic pain syndrome, had not responded to multiple forms of intervention, her compliance in pain management had been "poor,"[32] and he stated that she was "not a

---

[31]The defendant erroneously asserts that Dr. Ladd referred the plaintiff to Dr. Uteg based on an incorrect statement in the ALJ's decision (Tr. 18), and on letters that Dr. Uteg wrote to Dr. Bernui, the plaintiff's osteopath at MTFWG whom she saw before she began seeing Dr. Ladd.  *See* Docket Entry No. 13, at 9.

[32]At the plaintiff's next appointment with Dr. Ladd's office, on May 5, 2004, she was provided with samples of her prescription drugs.  (Tr. 415.)  Subsequently, on June 28, 2004, the plaintiff reported to VBHCS for a therapy appointment and reported that she had lost Tenn Care coverage and had run out of her medications.  (Tr. 380.)  At the time of that appointment, she had to be provided with drug samples due to her lack of insurance. (Tr. 380-81.)  Although the record does not indicate the date on which she lost her insurance, it is possible, if not likely, that the plaintiff may have merely run out of her medications due to inability to procure them, potentially explaining her negative drug screen in April.

Case 3:06-cv-00728   Document 14   Filed 03/31/08   Page 71 of 76 PageID #: 127

candidate for narcotic pain therapy for abnormal drug screen." Dr. Le noted that he was "returning [the plaintiff] to referring provider." *Id*. The plaintiff was next seen in Dr. Ladd's office by Ms. Evans on May 5, 2004. (Tr. 415.) At that visit, the plaintiff requested a referral to another pain manager, Dr. Bartholomew, and that request was granted. *Id*. The plaintiff was seen once more in July by Ms. Evans before Dr. Ladd completed his Medical Source Statement in September. (Tr. 414.) In light of the above, it is clear that Dr. Ladd did address Dr. Le's April 2004 letter by referring the plaintiff to another pain manager. Dr. Le indicated that he no longer considered the plaintiff a candidate for pain management with his practice, and Dr. Ladd referred the plaintiff to another pain manager. This response was entirely appropriate and certainly does not represent a reason to discredit the medical assessment of Dr. Ladd.

In sum, the ALJ failed to provide good reasons for rejecting the opinion of Dr. Ladd, a treating source. The ALJ was not free to accept the contrary opinion of Dr. Schull, a non-examining agency consultant, that the plaintiff was capable of performing a medium level of work. (Tr. 21.) Therefore, this case must be remanded for reevaluation of the treating source opinion of Dr. Ladd, either giving his opinion the controlling weight due to a treating source and evaluating an appropriate RFC, if any, in light of his opinion and all of the other medical evidence of record, or providing the requisite good reasons for not crediting his opinion in accordance with the relevant regulations and case law.

72

### 2. The plaintiff's additional assertions of error.

The plaintiff additionally argues that the ALJ did not properly evaluate the plaintiff's obesity in accordance with SSR 02-1p. Docket Entry No. 11, at 13. Although the ALJ acknowledged that the plaintiff was obese and that her obesity was a severe impairment, she failed to assess the effect that her obesity had when evaluating the plaintiff's limitations and assigning an appropriate RFC. SSR 02-1p states, "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately . . . [and obesity should be considered] when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity." Id. at *1. Therefore, on remand, the ALJ should additionally evaluate the effect of the plaintiff's obesity in accord with SSR 02-1p and other relevant regulations and rulings.

In her third assertion of error, the plaintiff objects to the ALJ's evaluation of the plaintiff's mental impairments. Docket Entry No. 11, at 14-15. The plaintiff's medical record contains extensive documentation of depression, anxiety, and recurring panic attacks. The plaintiff was prescribed anti-depressants, anti-anxiety medications, and other drugs to combat her mental impairments over the course of many years. She regularly attended therapy sessions to help cope with her depression, anxiety, and panic attacks, and even occasionally reported auditory and visual hallucinations. As of the time of her

hearing, the plaintiff's mental condition remained unresolved. The medical record clearly demonstrates a history of continuing mental distress. The plaintiff's GAF score was consistently assessed to be 50, a score reflecting serious symptoms according to the DSM-IV. The ALJ erred in glossing over the abundant information contained in the record, provided by both her primary care physician and her mental health professionals, in merely accepting the opinion of Dr. Kupstas, a non-examining DDS physician.[33] Therefore, the ALJ should additionally reevaluate and take into account the plaintiff's mental limitations in assigning an appropriate RFC, if any.

Finally, the ALJ should be directed to reconsider the plaintiff's subjective complaints and credibility in light of this Report and Recommendation. The Court has specific concerns that the plaintiff's inability to procure insurance coverage as well as her troubled mental health may have contributed to her ability to seek regular and appropriate treatment and to remain compliant on her medications. The ALJ goes so far as to question "where the narcotics were going since [the plaintiff] did not appear to be taking them," after the plaintiff's negative urine screen, suggesting that the plaintiff was selling her prescription drugs. (Tr. 20.) There is simply no foundation for such an accusation.

_____

[33]It is important to note here as well that the ALJ did not even consider the *entire* assessment provided by Dr. Kupstas. Had Dr. Anchor been allowed to consider Dr. Kupstas' whole opinion contained in Exhibit 12F (Tr. 355-76), he almost certainly would have concluded (and in fact, did initially conclude), that the plaintiff could not return to her previous work or perform other work based on her panic attacks. *See supra* discussion in III.B.

74

The ALJ noted that the plaintiff's testimony that she did "nothing" during the day, but "sometimes" drove to the grocery store was contradictory. Limited trips to the grocery store do not undermine the plaintiff's testimony that her daily activities were extremely limited.

Although the plaintiff did cancel some of her VBHCS appointments, on at least one occasion, the therapist cancelled her appointment (Tr. 397), and on still others, the plaintiff was actually attending another medical appointment.[34] Dr. Walters, after performing an examination and obtaining a current MRI, opined that the plaintiff was not a malinger. (Tr. 510.) In sum, the ALJ should be directed to give the plaintiff's credibility and her subjective complaints careful consideration on remand, evaluating them in accordance with relevant regulations and case law.[35]

---

[34]The plaintiff cancelled her March 16, 2004, therapy appointment (Tr. 385), but presented to NorthCrest for an MRI (Tr. 432).

Furthermore, as of March 5, 2003, the Hendersonville office to which the plaintiff reported for her mental health treatment did not have a therapist, and the plaintiff was referred to the Gallatin office for therapy. (Tr. 398.) The plaintiff resided at the same address in White House, Tennessee, at the time of her application (Tr. 53), at the time she presented to VBHCS (Tr. 401) in 2003, and at all other times her address is reported in the record. To travel to Gallatin from White House, a person must pass through Hendersonville or take indirect back roads. The distance to Gallatin traveling on state roads is approximately double the distance to Hendersonville from White House. Traveling to Gallatin for therapy would have presented an additional and significant obstacle for the plaintiff, given her history of panic attacks and her ability to drive only short distances.

[35]To the extent that the plaintiff seeks remand to a different ALJ, the Court declines to so recommend, in light of the specificity with which this Report and Recommendation has set forth the matters to be addressed on remand by the ALJ.

75

## III.  RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 10) be GRANTED.  The case should be remanded for consideration by the ALJ as set forth above.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made.  Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge

76